SAMUEL J. UNDERHILL *v.* GEORGE G. JOHNSON, and others.

Two actions.

SAMUEL J. UNDERHILL *v.* RICHARD F. BLYDENBURGH.

Four actions.   The six actions are now entitled:

GEORGE G. JOHNSON and AMOS F. BINGHAM, Appellants, *v.* WILLIAM JUDSON BLYDENBURGH, Executor, and others, Respondents.

Where the vendor of premises already incumbered has taken back mortgages from the vendee upon the several lots conveyed, and, by agreement between the parties, the vendor is not to proceed to foreclose any of said mortgages until the prior incumbrances are canceled by means to be furnished by the vendee, or by the sale of such mortgages or either of them; and where the vendor has mortgaged or pledged a portion of said mortgages as security for money loaned, and the pledgee forecloses the mortgages pledged, and has a surplus arising therefrom after satisfying his claims against the pledgor, the vendee, not having paid to the vendor the moneys agreed to be paid to cancel such incumbrances or a part of them, is not entitled to such surplus.

Where a large number of lots are embraced in the same conveyance containing general covenants of warranty, and, by arrangement, separate and distinct mortgages are given for the purchase-money upon separate lots of the land conveyed, the covenants are thereby distributed to the several lots conveyed, and are to be construed as though each parcel had been conveyed for the sum expressed in the mortgage.

BROWN, J.   A portion of the surplus moneys in controversy proceeded from the foreclosure and sale in the two suits first above entitled.   The mortgages were a part of a large number referred to hereafter, made by the defendant George G. Johnson to Richard F. Blydenburgh for purchase-money of the lands hereafter also referred to, and by him assigned to the plaintiff Samuel J. Underhill as security for a loan of money.   There was a surplus after paying Underhill, but a large deficiency to pay the sums secured by the mortgages.   So that had no other interests intervened, Blydenburgh would have been entitled to the money.

The surplus in the four actions secondly above entitled, were the proceeds of the foreclosure and sale of mortgages made by Richard F. Blydenburgh to Samuel J.

Underhill, as mortgagee, and were incumbrances upon the lands hereafter mentioned as conveyed by Blydenburgh to George G. Johnson, and upon which the latter executed back to the former mortgages to secure the purchase-money, and which were unpaid, so that Blydenburgh would also have been entitled to this surplus had not other interests intervened. Bingham claimed the surplus, as grantee of Johnson, of the mortgaged lands, and also, as assignee of Johnson, of certain unliquidated damages for a breach of the covenants of warranty in his deed, by which portions of his property had been lost to Johnson, and also for a breach of the agreement hereafter referred to in assigning mortgages given by Johnson on the purchase of the lands. Blydenburgh claimed the surplus, as also did William Peet, as receiver of the property and effects of Blydenburgh, duly appointed upon proceedings in the City Court and County Court of Brooklyn. The referee, to whom the claims of the creditors to the surplus was referred, awarded the moneys to the receiver. Bingham and Johnson appealed to the General Term of the Supreme Court for the second district, which affirmed the report; and thereupon Bingham and Johnson appealed to this court. The appeal is to be determined by the stipulations and agreements of Johnson and Blydenburgh in their contract of purchase and sale of the 15th of March, 1858, and their respective rights, duties and obligations under it. Its provisions are numerous and somewhat complicated, and I shall only refer to such of them as affect the question of the right to the surplus moneys in controversy.

By the contract, which was collateral to the deed, Blydenburgh sold to Johnson 211 lots of land in the city of Brooklyn, portions of which were subject to the payment of mortgages made by Blydenburgh, and to taxes and assessments to more than $80,000. The deed contained the usual covenants; the cash consideration for the lots was $200,000, but the credit price which was inserted in the deed was $266,350, and if the title to any of the lots failed, the grantor was to respond in the first proportion of the $200,000.

No money was paid, but in lieu thereof 211 mortgages.

One upon each lot, except five of the lots, which were covered by one mortgage. $80,000 of the mortgages, at the cash estimate, were at interest at seven per cent, payable annually, and the residue, $120,000, at the cash estimate, were at six per cent interest, payable annually, and were all payable five years from the date. Any one or more of the mortgages were to be assigned to any purchaser Johnson might obtain, for a sum equal in cash to the cash value of the premises, or on payment by Johnson of any taxes, assessments or prior mortgage of an equal amount, computing the mortgages at their cash value, and Blydenburgh was to assign the mortgages in any way to facilitate improvement. Blydenburgh was not to enforce payment, or use in any way the seven per cent mortgages so long as the prior mortgages upon the property remained unpaid, except so far as he paid taxes and assessments, or was required to pay and did pay the prior mortgages. And he was not to prevent Johnson, at his own expense, from getting as long credit as he could obtain upon the prior mortgages. Johnson, also, in terms, agreed to pay Blydenburgh $15,000 to enable him to pay off taxes and assessments, viz.: $5,000 on the 15th of May, $5,000 on the 15th of June, and $5,000 on the 15th of July thereafter, and Blydenburgh was to assign to him, or to a person he should name, seven per cent mortgages, at the rate of $6,666.66 for every $5,000 paid, or assign such mortgages as collateral security at double the amount of the money loaned. If Johnson failed to pay any or either of the said sums of $5,000 at the time appointed, then Blydenburgh was at liberty to enforce the payment of all the bonds and mortgages. Upon the payment of the $80,000 with the interest at seven per cent., and the $120,000 with the interest at six per cent, upon the assignment of such bonds and mortgages, without expense, to Blydenburgh, or upon the same being unassigned, the latter was to hold the balance or residue of such bonds and mortgages for the use and account of Johnson. And until the said $200,000, with the interest, should be realized by him over and above all expenses and taxes or accruments by assignment, Blydenburgh should be entitled

to enforce and collect all the said bonds and mortgages at their nominal amount. Johnson also agrees to pay everything he realizes from the property to Blydenburgh, or the holder of the mortgages in extinguishment thereof. Johnson never paid any part of the $15,000.

The same identical question presented upon this appeal arose in the case of *Braman* v. *Johnson* and others, decided at the General Term of the Supreme Court for the second district, where Mr. Justice LOTT, in the opinion, said : " It is evident from these different provisions, that the mortgages, taxes and assessments upon the property, at the time of the purchase, were to be satisfied with funds to be furnished by Johnson, and that he relied on the covenant of Blydenburgh, that the seven per cent bonds and mortgages for $80,000, were not to be used by him until the property was freed from incumbrances. Indeed, the effect of the agreement is to prevent Blydenburgh from paying off the old incumbrances unless with the assent of Johnson, or upon compulsion, or, at least, without being required so to do by the holders thereof. There is therefore no ground for the claim now made by Johnson, that Blydenburgh immediately, on the execution of the deed, became liable to him on his covenants therein, for the amount of the old mortgages, and such taxes and assessments, and that he, Johnson, is therefore entitled to a credit or set-off for the value of the property sold under the foreclosure of such mortgages as have been foreclosed, and for such taxes and assessments against the mortgage in question, which is one of those bearing six per cent, especially as it appears he has not made any payments to Blydenburgh to enable him to pay off such incumbrances. On the contrary, he is precluded from making any such claim by his express agreement, that Blydenburgh should not be sued on his covenants in respect to such incumbrances, unless and until such payments were made. The claim made for a deduction, founded on a want of title at the time of the sale, to some of the lots, is equally untenable. One of the means contemplated and relied upon in the arrangement of the parties for raising the purchase-money, was the sale and transfer of the

mortgages given therefor, and the more effectually to facilitate that object, separate mortgages were given upon the separate lots." This argument, it seems to me, is quite conclusive. The covenants in the deed were qualified by the provisions of the agreement, and the omission to pay off and extinguish the old mortgages, is attributable to Johnson, and not to Blydenburgh. It was not intended the latter should pay them.

In that part of the agreement which provides for the payment of the $15,000 in their several installments, it is declared to be essential for the security of Blydenburgh, and the proper working of the arrangement, that the arrears of taxes and assessments should be promptly paid, and that the $15,000 were necessary for that purpose. It then provides that Johnson should furnish it at the time specified, and declared that if he failed to do so, Blydenburgh might at once demand and enforce payment of any or all the bonds and mortgages. Johnson paid no part of it, indeed he never paid anything upon this large purchase, and now claims that the loss resulting from his omission to pay, shall be borne by Blydenburgh, who is to be made responsible to him. His neglect to pay the $15,000, which was so essential to the due and successful execution of the contract, was, in fact, an abandonment of it altogether. He had the nominal title to the premises, but that was all. The real title and right of property, was in Blydenburgh and the holders of the mortgages.

I think he has no claim, neither has Bingham, his grantee and assignee, upon the surplus moneys, and that the order of the General Term should be affirmed, with costs.

DENIO, Ch. J. In this controversy, respecting surplus moneys, the respondent, William Peet, as receiver of Blydenburgh, represents his interest, and the appellant, Bingham, equally represents the interest of Johnson, whose equity of redemption he has acquired. The assignment of the mortgage by Blydenburgh to Underhill was by way of mortgage of that instrument, to secure the note which Blydenburgh had

given to Underhill. The suit was against Blydenburgh as the mortgagee of the original mortgage, and against Johnson as the mortgagor of the real estate. All the defendants suffered the decree to be taken, as confessed, and the usual order of foreclosure and sale was made. But instead of applying the proceeds of the sale, after payment of the amount due to Underhill and the costs, to the discharge, as far as it would go, of the balance of the mortgage debt, it was directed to be deposited with the county treasurer, subject to the order of the court. As Underhill was only the assignee of Blydenburgh, and had no other or greater rights than he had, I am of opinion that the decree affirming, as it did, the validity of the mortgage, and the equitable right of Blydenburgh and his assignee to enforce it, precludes the appellant from raising the questions principally discussed by his counsel. It establishes that the mortgage was a valid security and incumbrance in the hands of Blydenburgh, and that he had a legal right to assign it by way of mortgage to Underhill. The appellant's points affirm that the mortgage was not operative, and was incapable of being enforced by the mortgagee or any assignee of his. The only position which I conceive to be open to Johnson, or his grantee, Bingham, to litigate, is that of payment to Blydenburgh of the mortgage debt, except so much thereof as was required to pay the note held by Underhill, or a set-off of enough to cover the balance of the mortgage debt beyond the debt to Underhill and interest.

There is no pretense of a payment of these particular mortgages, or of a set-off against the moneys due thereon. The surplus moneys are claimed on the ground that under the terms of the agreement of the 15th March, 1856, and the facts proved in connection with that agreement, Blydenburgh had no right to treat the mortgage as an operative security, or to assign it, and that the assignee was equitably precluded from enforcing it. The contrary of that position was held by the Supreme Court in the case of *Braman v. Johnson,* and that judgment has been affirmed in this court, and, as I

have said, the decree in the present case is a further adjudication against that defense.

But if we look again into the agreement the same result will follow. Although all of the large number of lots purchased by Johnson were embraced in a single conveyance, containing a general covenant of warranty, the mortgages were each upon the separate lots, and a provision in the agreement renders the covenant several and distributive, as though a separate deed and covenant had been given in respect to each of the several parcels of land embraced in each of the mortgages. After providing that in any action on the covenants, the consideration of the purchase of all the lots shall be reckoned as $200,000, and it is added that "if the title of any particular lot or lots shall fail, he (the grantor, Blydenburgh) shall only be held responsible for the first proportional part of such consideration for such lot or lots." The value of each lot or lots included in each mortgage, as adjusted by the parties, is the money secured by the mortgages respectively, and the covenants are therefore to be construed as though each parcel had been conveyed for the sum expressed in the mortgage, which was given by the purchaser to the vendor. It is not contended that Blydenburgh had not a good title to each of the lots embraced in this foreclosure, though he had no title to some others of them, or that any of the incumbrances which existed upon them has ripened into a title. The sale was subject to the rights of all of the prior incumbrancers, none of whom appear to have been made parties to the foreclosure. The moneys, therefore, which have been paid to Underhill, and the residue of the proceeds of the foreclosure sale, which is the subject of this controversy, represent the value of the interest acquired by Johnson, under his conveyance from Blydenburgh.

But I am of opinion that Blydenburgh had a right to treat the mortgage in question as a perfect and operative security on account of a default on the part of Johnson to perform the agreement. By a clause in the instrument Johnson was bound to pay $15,000 in three installments, the last one being payable by the 15th of July, four months from the date of

the agreement, for the purpose of discharging arrears of taxes and assessments. This stipulation seems to have been a condition precedent to the various stipulations by Blydenburgh for the advantage of Johnson; for it is declared to be essential to the proper working of the general arrangement; and also that in case of failure on the part of Johnson in this respect, Blydenburgh might at once enforce payment of all the bonds and mortgages. Blydenburgh was to afford certain accommodations and facilities to enable Johnson to raise the money. These were to consist in Blydenburgh assigning some of the bonds and mortgages to the parties who should advance the money, making such a deduction from the amount as Johnson would be entitled to, upon the payment of the amount himself; or to assign some of the bonds and mortgages as collateral security. But Johnson was to find the lenders, or, as it is expressed, raise the money. This he omitted to do. The main object of the agreement, it is apparent, was to obtain the advantage of Johnson's address and management in procuring funds to extricate the estate from its embarrassment, and it was obviously a most important matter, upon which the whole enterprise hinged. The only pretense of money raised by or through the agency of Johnson, was that spoken of by Bingham; but it was shown that this was obtained by the assignment of mortgages by Blydenburgh to Bingham as late as August and September, 1856, and after the default of Johnson in raising the $15,000. After such default, Blydenburgh, as we have seen, had a perfect right to demand and enforce payment of all the bonds and mortgages, and he could therefore assign them at his pleasure. The defect in the argument of the appellant's counsel consists in treating the assignments of mortgages made by Blydenburgh after the default of Johnson, as payments made by the latter under the agreement, of so much of the purchase-money. I consider, on the contrary, that in assigning them, after the default, Blydenburgh was only availing himself of his rights as mortgagee, which had become perfect by the default of Johnson in raising the $15,000.

The order should be affirmed.